JULY TERM, 1882, No. 90.            JANUARY 16, 1883.

# Hale & Kilburn Manufacturing Company's Appeal.*

1. Plaintiff and defendants entered into a contract, under seal, by which plaintiff assigned to defendants his patent for an improvement in wardrobe bedsteads, and defendants were to manufacture and introduce said bedstead, to term them in their advertisements " The Everitt Bedstead," to pay plaintiff a royalty of seven per cent. upon the wholesale price received by them, at the end of each month, " upon all the said patented bedsteads made and sold by them;" to keep full accounts, and if in default for sixty days, to re-assign the same; any improvements in said bedsteads to be held by the defendants, subject to the terms of the agreement. Defendants were in default for sixty days, broke their covenant to account justly, advertised them as the "Champion Folding Bed," and entered into a fraudulent conspiracy to deprive plaintiff of all benefit of his own invention, and to appropriate it exclusively to themselves, by purchasing a prior patent, upon which the patent of plaintiff did not infringe, and having it re-issued so as to cover plaintiff's patent, and secretly assigned to themselves. *Held :* Affirming the decree of the Court below, that the evidences of fraud were so manifest as to fully justify a court of equity in making a decree for a compulsory assignment to the plaintiff of the original patent, with all the improvements made by the defendants, and also of the reissued patent under which the fraud was attempted to be perpetrated.

2. The royalty due plaintiff is chargeable on the price of the completed bedstead, whether expensively or plainly finished, and including springs, ornaments, and all that constitutes the complete bedstead when sold.

3. The defendants cannot be permitted to deduct the cost of the reissued patent from the balance of account due to plaintiff.

4. One who has a common interest with, and a confidential relation to, another cannot avail himself of an outstanding or hostile title or incumbrance to the prejudice of his fellow, much less can he create one himself.

5. When he has created such a title, the wrong-doer will be held in equity to be a trustee, *ex-maleficio,* for the benefit of the interest intended to be defrauded, and equity will compel a conveyance to the *cestui que trust,* without compensation.

Before MERCUR, C. J., GORDON, PAXSON, STERRETT, and GREEN, JJ.

Appeal from the decree of the Court of Common Pleas, No. 4, of *Philadelphia County.*

Bill in equity filed by Elisha E. Everitt against Henry S. Hale, Artemus Kilburn, J. Warren Hale, Cheney Kilburn, and Warren Hale, who survived H. W. Curtis, with

*An appeal to the Supreme Court of the United States is pending.

whom they traded as Hale, Kilburn & Company, and The Hale & Kilburn Manufacturing Company.

The bill was filed on September 24, 1878, and alleged that on March 24, 1874, a patent was issued to the plaintiff for an improvement in wardrobe bedsteads ; that on April 16, 1874, the plaintiff entered into a contract in writing with Hale, Kilburn & Co., whereby it was, *inter alia*, stipulated that his patent should be assigned to them, and that they should pay him $500. It proceeded :

"*Second*. The said parties of the second part agree to pay to said party of the first part, his heirs or assigns, a royalty or patent fee upon all of the said patented bedsteads made and sold by them, at the rate of seven per cent. upon the wholesale prices received by them therefor ; and, furthermore, to pay to said party of the first part, his heirs or assigns, one half of the net profits which they may derive from the sale of any rights and licenses in and under said letters-patent ; and they agree to account for, in writing, and to pay over such sums as may be due under this clause of agreement, at the end of each and every month, from and after the date hereof ; and, furthermore, to keep just and true books of accounts, to be open, at all reasonable times, to the inspection of said party of the first part, his heirs, assigns, or his or their duly authorized agent or agents, and showing the number of said patented bedsteads made and sold by them, and the prices received therefor, and showing also all rights and licenses granted under the patent, and the amount received therefor.

*Third*. The said parties of the second part promise and agree to use all reasonable efforts to promote the sale and introduction of the said patented bedsteads.

\*        \*        \*        \*        \*        \*

And if the said parties of the second part, or their said assignees, shall at any time fail to account for and pay over, when due, sums accruing to the said party of the first part, his heirs or assigns, under the terms of the agreement, and shall continue in said default for sixty days after demand for payment, or, if they shall fail to keep the stipulation made in clause three hereof, then, and in any such case, the party or parties so in default shall forfeit all his or their interest in said letters-patent, and shall re-assign the same, by proper instrument in writing, to the said party of the first part, his heirs or assigns.

*Sixth*. It is further understood and agreed that the said patented bedstead shall be known as the 'Everitt

bedstead,' and the said parties of the second part shall so term it in their advertisements, circulars, etc.          *

*Seventh.* It is further understood and agreed that any improvements in said patented bedsteads which may be made by either of the parties hereto, and any letters-patent of the United States obtained for such improvements, shall be held and enjoyed by said parties of the second part, under and subject to the terms of this agreement ; and the said party of the first part, for himself, his legal representatives and assigns, promises and agrees that at the request and expense of the said parties of the second part, or their assigns, he will obtain letters-patent of the United States for any such improvements made by him, and will execute and deliver proper assignments of the title to said letters-patent to said parties of the second part or their assigns.''

The bill further averred that, on October 3, 1876, the Hale & Kilburn Manufacturing Company succeeded Hale, Kilburn & Company, and became assignees of the patent and contract ; that defendants have made and patented improvements on the plaintiff's patent, and have made and sold bedsteads under the patent and its improvements, for which they have not accounted to the plaintiff—the defendants have refused to account or pay ; that they have refused plaintiff access to their books ; that they are more than sixty days in default, and that, to defraud plaintiff, they have bought the patent of one Stark, and, as an excuse to hinder and defraud plaintiff, have caused a suit to be brought in the name of Stark to enjoin their use of plaintiff's patent.

The bill prayed for an account, a re-assignment of said patent and improvements and rights thereunder, and for an injunction to restrain defendants from disposing of said patents and improvements, and from manufacturing and selling thereunder.

The answer, which was filed November 22, 1878, and amended December 10, 1878, admitted the averments of the bill as to the plaintiff's patent ; the contract with Hale, Kilburn & Co. ; the succession of the Hale & Kilburn Manufacturing Company ; submits whether their patents are for improvements to the plaintiff's patented process ; denies that plaintiff has been refused access to the books, or that defendants have failed to account, and annexes an account to the answer, showing a balance due to the plaintiff ; admits that the defendants are in default in payment to the plaintiff ; offers to re-assign the patent ; avers that they secured the control of the Stark and Maine patents

in good faith and with the plaintiff's knowledge, and charges that plaintiff's patent is void for want of novelty and utility.    The answer then submits to a decree in favor of the plaintiff except under the second prayer of the bill.

After a hearing on bill and answer, the Court, on December 9, 1878, appointed C. Stuart Patterson, examiner and master, and made an interlocutory decree directing, first, a reference to the master to take an account of all and every the bedsteads and furniture manufactured after April 16, 1874; second, an injunction as prayed for ; third, a reference to the master "to take testimony upon the matters contained in the second prayer of the bill," etc.

On May 5, 1879, an amendment to the bill was filed, which averred that there was such a relation between plaintiff and defendants that the latter could not, "during the existence thereof, acquire title to said Stark's patent adversely" to plaintiff, and prays that the defendants be decreed to assign to plaintiff Stark's patents and all rights thereunder.

The Master found, *inter alia*, the facts as follows :

On November 19, 1873, the plaintiff filed in the Patent Office of the United States his petition for letters-patent for an improvement in wardrobe bedsteads.    His application was rejected on November 22, 1873, again on December 3, 1873, and again on December 12, 1873, and as grounds of objection, the Patent Office Examiner referred to prior patents supposed to cover the same subject-matter, granted on August 22, 1865, to A. Stark ; on June 15, 1865, to S. C. Maine ; on September 6, 1870, to Davis & Romminger, and on May 28, 1872, to H. Goodrich. The objections of the Examiner were, however, overcome by successive amendments to the specifications of claim, and on March 24, 1874, letters-patent were granted to the plaintiff, numbered 148,940.

On August 16, 1874, the plaintiff entered into a written contract with the defendants, Hale, Kilburn & Co., as set forth in the bill.    The contract was drawn by the solicitors of the defendants.    There is nothing to show that plaintiff, as an inducement to the making of the contract, made any representation to the defendants in regard to the existence or nature of prior and subsisting patents for the same or a similar subject-matter.    After a search had been made in the Patent Office, the contract was recorded.    The defendants had taken the opinion of patent solicitors in Washington, and were advised that plaintiff's patent did not infringe upon the Maine patent.

Shortly after the execution of the agreement with the

[Hale & Kilburn Manufacturing Company's Appeal.]

plaintiff, the defendants appear to have begun the manufacture of his beds, and their first sale was made in September, 1874.   On October 3, 1876, the Hale & Kilburn Manufacturing Company, also a defendant, was organized, and was thenceforth successor to and substituted for Hale, Kilburn & Co.

The defendants appear to have made regular monthly payments on account of plaintiff's royalty until January, 1877, when they demanded and he refused to give receipts in full settlement to date ; and during some portion of the period before 1877, the plaintiff seems to have been in their debt, according to their statement of account. In July, 1877, defendants refused to pay royalties on certain styles of bedsteads, which they distinguished as Nos. 10 and 11, although the bedsteads so numbered were marked as being made under plaintiff's patent.   Defendants afterwards withdrew their objections, and until April, 1878, the royalty seems to have been paid with regularity.   Defendants kept a book for plaintiff's inspection, but did not permit him to have access to the books of original entry.   From the account, as furnished by defendants, they omitted the springs, which are an essential part of the bedsteads, and the bedsteads furnished with ebony or mirrors they understated the prices, and made a uniform and unauthorized deduction by way of discount from the wholesale prices actually received by them.   The account so stated was the basis of defendants' payment of royalty.   The defendants persistently violated that part of the agreement which provided that the bedstead should be known as the "Everitt Bedstead," announcing it in their advertisements as the "Champion Folding Bed."   As the sales of the bedstead increased, the defendants seemed to have formed the purpose of compelling his reduction and ultimate relinquishment of the royalty.   In July, 1877, the defendant, C. Kilburn, asked the plaintiff to reduce his royalty from seven to three and one half per cent. ; and on his refusal, Mr. Kilburn threatened that the defendants would stop the manufacture, or make only enough to hold the bed and keep others from making it.   In the summer of 1877, Mr. Kilburn told Asher B. Stevens, a mechanical inventor, that defendants were paying a heavy royalty, and directed him to get up a new bedstead.

Prior to December, 1876, the defendants had consulted and retained as counsel Mr. D. Rodney Mason, who testified that he had advised the defendants how they could manufacture the folding bed and avoid any pre-

tense of infringing upon the plaintiff's patent. In the latter part of December, 1877, Mr. Stevens, having com-, pleted the model of his proposed bedstead, showed it, at defendants' request, to Mr. Mason ; and on February 28, 1878, Mr. Mason wrote to defendants, advising them to discontinue the use of the Everitt patent, and expressing his approval of Stevens' invention, as avoiding any infringement upon Mr. Everitt. In the course of his examination of the subject of folding bedsteads, Mr. Stevens saw a drawing of the Stark bedstead, and showed the. drawing to defendants, who directed him to open communication with Mr. Stark, but, before he had accomplished that, Mr. Stark came to defendants' office, having seen their advertisement. Mr. Mason testified that ·the plaintiff's patent did not infringe upon the Stark patent, as it had been originally granted, but that the Stark patent was susceptible of being re-issued in such shape as would entirely cover the Everitt bedstead.

On February 23, 1878, defendants bought his patent from Mr. Stark for $1,000, not for the purpose of protecting the Everitt patent against a possible infringement, but for the purpose of so using the Stark patent as to defeat plaintiff's claim for royalty.

Mason then drew a petition for re-issue to the defendants of the Stark patent, and a formal assignment of the patent to the company defendant. On February 28, 1878, defendants wrote to Mr. Mason that "Mr. Stevens left for Washington last night, and took with him Stark's papers and check. You understand, we suppose, that if Stark's patent can be made to cover Everitt, we do not care to make any alterations in the bed, or adopt any of Mr. Stevens' plans. The bed is just splendid as it is, and we hope you can fix us all right."

On March 6, 1878, defendants, not having recorded the former Stark papers, had Stark to sign a petition for a re-issue, in which the specifications were drawn so as to cover the Everitt patent. This application for a re-issue was granted April 9, 1878. The old assignment from Stark to defendants had been destroyed, and a new assignment to defendants was drawn and executed by Stark, but was not recorded until December, 1878. On March 4, 1878, defendants wrote to Mr. Mason, suggesting that he should notify them that they infringed on Stark's patent ; and afterwards wrote several letters relating to the same subject. On April 10, 1878, Mason wrote to defendants, as attorney for Stark, charging them with infringing the Stark patent in manufacturing the

"Everitt bedstead." This letter was shown by defendants to plaintiff, and was used by them as a reason for refusing to pay the plaintiff his monthly installment of royalty then due. The plaintiff declined to recognize Stark's claim, and the defendants made him a small payment on account of his royalty. Other letters passed between defendants and Mr. Mason, which were not shown to plaintiff. On May 22, 1879, a meeting was held at the office of E. C. Mitchell, who had been retained as counsel for plaintiff. There were present: Messrs. Connolly and Mitchell, as his counsel; the defendants, with Mr. Otterson, who was not aware of the relations between his clients and Stark and Mason, as their counsel; and Mr. Mason, really counsel for the defendants but professing to represent the adverse interest of Stark. At this meeting, Mr. Kilburn denied that defendants owned the Stark patent, and Mr. Mason offered, on Stark's behalf, to grant a license under the Stark patent, in consideration of a five per cent. royalty, which would have to be deducted from plaintiff's seven per cent. royalty.

On July 8, 1878, Mr. Mason, as counsel for Stark, filed in the Circuit Court of the United States a bill in equity, in which Stark was plaintiff, and the Hale and Kilburn Manufacturing Company was defendant, for an injunction restraining defendants from the further manufacture of bedsteads, for an account, &c.

The master further finds that defendants are in default, and have continued in default for more than sixty days before the bill was filed; that they have obtained and now hold patents for improvements in wardrobe bedsteads other than those above mentioned, and that the defendants' negotiations with Stark were concealed from the plaintiff; that he was not offered an opportunity to participate in the purchase of the Stark patent, and that the defendants secretly purchased that patent in their own right for the purpose of using it as a means to compel the plaintiff either to abandon his patent, or to so modify his contract as to let them manufacture under his patent for a diminished royalty.

The report concluded:

"The relation of confidence between the parties created by the contract for the manufacture and sale by the defendants, under the plaintiff's patent, the defendants' covenants to promote the sale and introduction of the bedsteads made under the plaintiff's patent, and to advertise the bedsteads under the plaintiff's name, and the defendants' fraud, beginning in their suppression of the

plaintiff's name in their advertisements, continuing in their false accounts, and fitly concluded by their secret purchase of a prior patent, their re-issue of that patent in such shape as to cover the plaintiff's patent, and their sham suit for infringement against themselves, all combine to make a case which merits the severest condemnation which a court of equity can impose. The master reports that the defendants be directed to assign to the plaintiff the Stark patent, and all their rights thereunder. The defendants cannot be permitted to deduct the one thousand dollars paid by them to Stark from the balance which is due by them to the plaintiff under the account. Having failed in their speculation in the purchase of the Stark patent at the plaintiff's expense, they must be content to bear the loss.''

The master recommended a decree that defendants pay to plaintiff the sum of $6,788 07, with interest from December 10, 1878 ; that defendants assign and deliver to plaintiff all the letters-patent for improvements in folding bedsteads, held by them, and also the re-issued patent granted to Andrew Stark, and that defendants pay the costs.

The defendants filed exceptions to the master's report, which the Court dismissed, THAYER, P. J., delivering the following opinion :

''A careful and thorough examination of the master's report and of the voluminous testimony taken in this case has convinced us of the correctness of the master's findings, and that the conclusions of law which he has reached are reasonable, just, and entirely in accordance with well-established principles of equity. No doubt whatever rests upon our minds of the bad faith of the defendants in their dealings with the plaintiff. It is proved by a mass of testimony and a concurrence of circumstances which establishes it beyond the possibility of a doubt. Their own uncontradicted acts, letters, and oral communications convict them of it so plainly that it is incapable of denial. An attentive perusal of the testimony leaves it a self-evident fact which requires neither argument nor demonstration to establish it. They not only broke their express covenant to account justly with the plaintiff, and to pay him monthly his stipulated percentage of the sales, but the evidence shows that they entered into a fraudulent conspiracy, the successive steps in which brought them to the borders, if not actually within the lines of criminal responsibility. The object of this conspiracy was to deprive the plaintiff of all benefit of his own invention, and

to appropriate it exclusively to themselves. The means by which it was to be accomplished was the purchase of the Stark patent, which Mason, their own counsel, testified, was not infringed by the plaintiff's patent, the fraudulent re-issue of that patent, with such cunning devices, that it should be made "to cover entirely the Everitt bedstead," and a secret assignment by Stark to themselves of that which they already owned; to be followed by false and covinous notices to and sham suits against themselves, brought under their own instructions and by their own counsel. All this was duly carried out, was duly discovered by the plaintiff, and is established in all its details in the evidence. The defendants now complain that the master has reported that they cannot be permitted in equity to avail themselves of this fraud, and to consummate it by being allowed to set up this fraudulent instrument as a defense to the plaintiff's demands. Nothing can be plainer than that upon the state of facts here exhibited the plaintiff is entitled, by some form of decree, to be protected against a deed obtained in the pursuit of this fraudulent and injurious purpose. Sometimes equity affords this protection by requiring the delivering up and cancellation of the fraudulent instrument; sometimes by a perpetual injunction against the use of it. What substantial difference does it make to the defendants whether the plaintiff is protected by such a decree, or by a decree requiring him to assign the re-issued patent to the plaintiff? The master has proceeded upon the well-established principle that one who has a common interest with and a confidential relation to another cannot avail himself of an outstanding or hostile title or incumbrance to the prejudice of his fellow. Much less can he create one himself. Where he has acted in good faith he will in equity be held to be a trustee of a title obtained for the common benefit, and will be entitled to be re-imbursed a proportionate part of the expense of acquiring it; but where he has obtained it for the purpose of defrauding his partner in the adventure he can neither claim any benefit from it himself, nor demand indemnity for his outlay. In such cases the wrong-doer is held in equity to be a trustee, *ex maleficio*, for the interest intended to be defrauded, and equity will compel a conveyance to the *cestui que trust* without compensation. The maxim, that no man shall take advantage of his own wrong, prevails in equity even more strongly than at law, and with regard to actual fraud the principles of equity in their application to remedial justice are far more comprehensive. Equity will

never permit a person to hold a benefit which he has derived from the perpetration of an actual fraud. Neither will it allow him compensation for it in any form whatever. In equity no man can set up his own iniquity as a defense any more than as a cause of action. Our reports are full of cases of constructive trusts arising *ex maleficio*, and it is well settled by many decisions that where an advantage has been gained by an actual fraud, the wrongdoer, who is converted into a trustee *ex maleficio*, is in no condition to demand indemnity for his outlay.

These principles have often been applied in this State in various forms of procedure in equity and at law. Most frequently in actions of ejectment, as in Sharp *v.* Brady, 4 Casey, 433, and Seydlar *v.* Carson, 19 Smith, 81, and the numerous cases there cited by Judge Williams, in which a purchaser acquiring a title by fraud at a sheriff's sale has been held to be a trustee, *ex maleficio*, for the person wronged, who might recover against him without a return of the purchase money paid. It is often applied in bills *quia timet*, of which application O'Neil *v.* Hamilton, 8 Wright, 18, is an illustration, where a fraudulent grantee was compelled to make a conveyance, although he had paid $1,000 for his title. Such a trust, *ex maleficio*, arises whenever a person holding fiduciary relations to another abuses the confidence reposed in him by taking and claiming for himself property which he ought to have applied to the protection of their common interest. The rule was clearly laid down by Sharswood, J., in Duff *v.* Wilson, 22 Smith, 442, and the other cases cited by the master in his report. It is more strongly applied in equity than at law, for the maxim there is, "He who has done iniquity shall not have equity." It is apparent, therefore, that even if the construction upon which the defendants so strenuously insist should be put upon the fifth and seventh articles of the agreement, and it should be conceded that their covenants to assign, in case of failure to comply with their contract, extended only to improvements made by the parties, their case is no better, for they are still, by reason of the actual fraud practiced, within the operation of the equitable principle which makes them trustees, *ex maleficio*, without any title to compensation. But, in the present case, the defendants created themselves the very title which is alleged to be hostile to the plaintiff's rights, for without the re-issue of the Stark patent, which they obtained, the plaintiff would have been in no danger. The plaintiff is entitled, therefore, to relief and protection against the defendants' fraudulent

re-issue of the Stark patent. He might have it by a perpetual injunction against the assignment or use of that patent, or he may have it upon the principles already adverted to, in the form of a decree for the compulsory assignment of it to the plaintiff. The form of the relief is not very material, for the result is the same in either case. The master has seen fit to recommend the latter alternative. In this, we think, he is fully sustained, both by reason and authority, and by the evidence in the cause, and we see no reason to dissent from his conclusions in that respect.

We are also of opinion that defendants have no just ground of complaint against the master for the manner in which he has settled and stated the account. The royalty was, by the terms of the agreement, chargeable on the price of the completed bedstead, as a whole, whether expensively or plainly finished, and including springs, ornaments, and all that constituted the complete bedstead when sold. It was not upon any bedstead of a particular pattern, but "upon all the said patented bedsteads made and sold by them." We see no reason to doubt the correctness of the master's statement, that he has credited the defendants, in his supplemental report, with all the bedsteads shown not to have been delivered. It clearly appears also, upon a careful comparison of the duplicate charges contained in the defendants' printed statement of those charges, submitted to the Court, with the supplemental report submitted by the master (Exhibit C), that they have all been corrected in that report. A careful examination of the case, and of the forty-three exceptions filed by the defendants, has brought us to the conclusion that none of the exceptions are sustained. Let a decree, therefore, be drawn up for the plaintiff, in the form reported by the master on page 52 of this report, corrected as to the amount of the defendants' indebtedness according to the result reached by the master in his supplemental report.

Exceptions dismissed."

The defendants appealed from the decree entered in accordance with the above opinion, and assigned as error the dismissal of the exceptions, the confirmation of the report, and the granting of the said decree.

*J. Edward Ackley, George Biddle, James Otterson,* and *George W. Biddle* for appellants.

Many of the goods marked in the order-book as de-

livered were afterwards returned, and should not have been taken into account. Royalties should not be allowed on bedsteads which were only marked in the order-book, as the use of the order-book is not to make charges. It would not be evidence in an action for goods sold and delivered : Rhoads v. Gaul, 4 Rawle, 404.

The agreement allows the royalty only upon all bedsteads sold. A subsequent exchange or return should avoid the royalty. The master has allowed royalties twice upon the same bedstead. He has included the charges for boxing, &c., which are not subject to royalty. The master erred in adding thirty-three and one third per cent. to the returns from their agents, which it does not appear was collected, because the contract allows royalty only on wholesale prices, which means the sixty-six and two thirds per cent. actually received. The springs, the mirrors, and ebony strips were not parts of the bedstead upon which royalties should be allowed.

The complainant is not entitled to the Stark patent, because the agreement refers only to the Everitt patent, or improvements thereunder. An improvement has essential reference to a subject-matter to be improved : Page v. Ferry, 1 Fish Pat. Cas., 298.

A re-issue must be for the same invention : U. S. Revised Stat., sec. 4916 ; Bump on Patents, 170, 179, 180, 148 ; Seymour v. Osborne, 3 Fish, 555 ; 11 Wall., 516 ; 3 Story, 742 ; 1 Fish Pat. Cas., 509 ; O'Reilly v. Morse, 15 How., 62 ; Battin v. Taggert, 17 How., 74 ; Bischoff v. Wethered, 9 Wall., 812 ; Betts v. Menzies, 116 E. C. L. R., 1001.

The doctrine of Keech v. Sandford, 1 L. C. in Eq., 48, does not apply where two parties go into a joint venture : Bast's Appeal, 20 P. F. Sm., 301.

Complainant had no right to royalties on sales made after filing this bill.

*Wendell P. Bowman* and *E. Coppee Mitchell* for appellee.

The answer admits the liability to account.

The master's report has the same weight as the verdict of a jury : Reeside v. Reeside, 6 Phila., 507. The exceptions do not refer to the particular items objected to, and are not in accordance with the requirements of equity practice : Mengas, Ap., 7 Harris, 221 ; Dexter v. Arnold, 2 Sum., 108 ; White v. Hampton, 10 Iowa, 238 ; Holcomb v. Holcomb, 3 Stockton, 281 ; Smalley v. Corliss, 37 Vt., 486 ; Foster v. Gressett, 29 Ala., 393 ; Green v. Weaver,

1 Sim., 404; 2 Smith's Chancery, 372; Rule 12 Eq. Rules, pl. 69.

The appellants fixed the wholesale prices at ten per cent. discount and fifteen per cent. on cash sales. The master has made his calculations upon this basis. The royalty can only be rated by taking all the parts that go to make up the bedstead.

The appellants are estopped from questioning the validity of the patent of the appellee: Hilliard on Contr., Vol. 2, p. 191.; 5 E., 449; Beed *v.* Blandford, 2 Y. & Jerv., 284; 284; Brinley *v.* Tibbets, 7 Greenl., 70; Kinsman *v.* Parkhurst, 18 How., 289; Crossley *v.* Dixon, 10 H. of L. Cases, 293; Bigelow on Estoppel, 338. They cannot defend on the ground of failure of consideration, until the owner of the prior patent has deprived them of the monopoly: Angier *v.* Eaton, 11 W. N. C., 146; Marston *v.* Swett, 82 N. Y., 527; or until a decree against appellee's patent: Patterson's Ap., 11 W. N. C., 572; Duff *v.* Wilson, 22 P. F. Sm., 442.

Appellee is entitled to the Stark patent under the terms of the agreement.

To avoid the necessity of a new suit, the account is always brought down to the time of stating the account: Tatham *v.* Lowber, 4 Blatch., 86; Wilson *v.* Sandford, 10 How., 99; Hartell *v.* Tilghman, 9 Otto, 547; Blanchard *v.* Sprague, 1 Clifford, 288.

The parties were not partners, but merely licensor and licensees.

JANUARY 29, 1883.—PER CURIAM: Notwithstanding the full and able argument of counsel for the appellants, we are unable to discover any error in this decree. The evidences of fraud on the part of the company are so manifest as to fully vindicate the conclusion of the Court and to justify the decree.

Decree affirmed and appeal dismissed at the costs of the appellants.